1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF IDAHO

3   JAMES C. HILLIARD, an        )
    individual,                  )
4                                )   Case No. 1:18-cv-00232-DCN
              Plaintiff,         )
5                                )
                                 )   Boise, Idaho
6        vs.                     )   November 15, 2019
                                 )   10:08 a.m.
7   MURPHY LAND COMPANY, LLC,    )
    an Idaho Limited Liability   )
8   Company,                     )
                                 )   Summary Judgment Hearing
9             Defendant.         )
    _____ )

10                    TRANSCRIPT OF PROCEEDINGS
11             BEFORE THE HONORABLE DAVID C. NYE
            UNITED STATES DISTRICT COURT CHIEF JUDGE

12

13   APPEARANCES: See page 2.

14

15

16

17

18

19

20

21

22
    Court Reporter:  Katherine Eismann, CRR, RDR
23                   katherine_eismann@id.uscourts.gov
                     702-409-3556
24
    Proceedings reported by machine shorthand.  Transcript produced
25   by computer-aided transcription.

1    APPEARANCES:

2    For the Plaintiff:

3            JAMES LLOYD DAWSON, ESQ.
             Gates Eisenhart Dawson
4            125 South Market Street, Suite 1200
             San Jose, CA 95113
5            508-288-8100

6            MARTIN J. MARTELLE, ESQ.
             Martelle, Bratton & Associates, P.A.
7            380 West State Street
             Eagle, ID 83616
8            208-938-8500

9    For the Defendant Murphy Land Company, LLC:

10           DANE ANDREW BOLINGER, ESQ.
             Hawley, Troxell, Ennis & Hawley, LLP
11           877 Main Street
             Boise, ID 83702
12           208-388-4826

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thursday, November 15, 2019, 10:08 a.m.)

2                          --oOo--

3                  P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          COURTROOM DEPUTY:  Court will now hear the motion in

6     Case Number 1:18-cr-232-DCN, Hilliard versus Murphy Land

7     Company, LLC.

8          THE COURT:  Good morning.

9          Counsel, if you will just begin by identifying who is

10    here today at the tables.

11         MR. BOLINGER:  Good morning, Your Honor.  Dane

12    Bolinger, Hawley Troxell, on behalf of Murphy Land Company.

13    And with me is vice president and general counsel of Murphy

14    Land Company, Steven Schossberger.

15         THE COURT:  And which one of you will be arguing

16    today?

17         MR. BOLINGER:  I will be arguing, Your Honor.

18         MR. MARTELLE:  Judge, I'm Martin Martelle.  I'm

19    acting as local counsel along with Mr. James Dawson who will be

20    arguing.

21         THE COURT:  All right.  Gentlemen, I don't think any

22    of you have ever appeared in front of me before.  You have?

23         MR. MARTELLE:  In the *Misen* case, Your Honor.

24         THE COURT:  Oh, okay.  All I was going to say is that

25    I'm not one of those judges who are -- who is going to barrage

1   you with questions during your argument.

2            If I have a question, I will ask it.  But I prefer to

3   let you go with your flow and what you have prepared, so just

4   know that up front.

5            All right.  So, whose motion is this?  We are here on

6   summary judgment.  Your motion?

7            MR. BOLINGER:  Murphy Land Company's motion, Your

8   Honor, yes.

9            THE COURT:  You may go ahead and proceed then.

10           I will tell you that I have read the briefs.  I have

11   read my law clerk's memorandum.  I haven't dived down into all

12   the exhibits, but I will before I issue a decision.

13           MR. BOLINGER:  Okay.  Thank you, Your Honor.

14           And Your Honor, I'd like to reserve about 10 minutes

15   of my allotted 20 minutes for potential rebuttal arguments.

16           THE COURT:  That's fine.

17           MR. BOLINGER:  Well, we are here today on Murphy

18   Land's motion for summary judgment on the plaintiff James

19   Hilliard's complaint, your Honor.

20           And first, as discussed in Murphy Land's reply brief,

21   Murphy Land would like to take the issue off the table from the

22   Court's consideration about whether Mr. Hilliard failed to

23   properly give notice of his intent to exercise the option.

24           Murphy Land Company reserves all rights on the issue

25   but removes the argument as a basis of granting summary

1    judgment, so we can just remove that from -- from the Court's

2    assignment.

3        THE COURT:  All right.

4        MR. BOLINGER:  But the Court should still grant

5    Murphy Land's summary judgment motion for four primary reasons.

6        Number one, Hilliard has no rights in the option

7    agreement, because he failed to close within 60 days of

8    exercising the option as required by the clear terms of the

9    agreement.

10       Number two, the agreement expired on December 30th,

11   2016, without Hilliard consummating the agreement.

12       Number three, Hilliard's unpled damages theory,

13   purportedly $3 million in lost crop damages, has no connection

14   to the express language of the contract that Hilliard could

15   only exercise the option, quote, "for, and only for, use as a

16   nuclear power plant."

17       And number four, additionally, even if Hilliard had

18   pled a claim for specific performance, which he did not, that

19   claim would still fail because Murphy Land no longer owns any

20   interest in this property.

21       Turning to the first issue about the language of the

22   option agreement, Section 9 of the agreement, Your Honor,

23   Section 9(a) entitled "Closing Date," which Your Honor can find

24   in the docket at Docket 21-3, states that the closing of the

25   purchase of the property ("Closing") shall be held at the

1    offices of the title company or at such other places as seller

2    and buyer may agree within 60 days after the date of exercise

3    of the option."

4              The parties also entered into a Memorandum of Real

5    Estate Option to Purchase Agreement.  And that was recorded in

6    the Owyhee County Recorder's Office, Your Honor.  It was signed

7    by both parties.  And that can be found at Docket 21-4.

8              And there's similar language in the recorded

9    memorandum regarding the time period to consummate the closing.

10   So, it references the 60 days from the date of option to

11   exercise.  And it also says -- important language in there,

12   Your Honor, that says if the terms of the agreement are not

13   followed, that, quote, "The terms and provisions of this

14   instrument shall terminate and be of no further force or effect

15   whatsoever," unquote.

16             So, assuming for the purposes of this motion, Your

17   Honor, that Hilliard did exercise the option on July 27th,

18   2016, which is what he contends, then 60 days after that is

19   September 25th, 2016.

20             It is undisputed in this record that Hilliard didn't

21   close or consummate the purchase before September 25th, 2016.

22   Therefore, under the strict terms of both the option and the

23   recorded memorandum, Mr. Hilliard's option terminated and is of

24   no further force and effect whatsoever.

25             And we cite to case law in our various briefings,

Your Honor, that support this very idea.  In the *Cristo Viene*
*Pentecostal Church versus Paz* case from 2007, the Idaho Supreme
Court looked at an option agreement that had a closing
obligation.  And the Idaho Supreme Court held that the
plaintiff had failed to honor the clear language of the option
including that the plaintiffs had failed to close the purchase
through the identified title company.

So, this has been addressed by the Idaho Supreme
Court.  The Idaho Supreme Court says, "Yep, that's an
enforceable provision."  And there is no dispute that the
closing did not occur.  There's no question of fact that
Hilliard failed to tender the purchase price.  There is no
question of fact that Hilliard failed to open any escrow
account.  There is no question of fact that Hilliard failed to
even attempt to schedule a closing.  It's undisputed that no
closing ever took place.  Those are all undisputed facts.

So, thus under *Cristo*, in the clear language of the
parties' contracts, the option expired, and Hilliard lost all
rights to enforce it.

Along similar lines, Hilliard's claim also fails
because he failed to complete the purchase of the property or
to consummate it before the agreement expired on December 30th,
2016.

In the agreement, it identifies the effective date of
the agreement as December 30th, 2010.  Section 1 of the

1  agreement says that upon exercising of the option, it is

2  automatically converted to a purchase agreement.

3  Section 2 of the agreement says that the term of the

4  agreement is six years from the effective date.  So, as soon as

5  he exercised the option, the contract converted to a purchase

6  and sale agreement that had an expiration date of

7  December 30th, 2016.

8  And as we discussed, the recorded memorandum also

9  references the expiration date of the contract and says, "If

10  that time period expires, the terms and provisions of this

11  instrument shall terminate and be of no further force or effect

12  whatsoever."  And it is undisputed that Hilliard did nothing to

13  effectuate and consummate the performance of this agreement

14  prior to December 30th, 2016.

15  And we refer the Court to the case law discussed in

16  our briefing, specifically, the *Riley* case and the *Alday* case

17  from the Ninth Circuit that says, "Effective expiration dates

18  in contracts are enforceable, and failure to take action within

19  the dates means that the parties lose rights in the agreement."

20  So, Murphy Land is entitled to summary judgment on both those

21  points, Your Honor.

22  As another point, Hilliard's complaint, as it's

23  currently pled, is moot, because he only seeks a pleading for a

24  declaratory judgment, Your Honor.  And specifically, he asks

25  for a declaratory judgment that the option was properly

1   exercised.  But that case is moot, because all of Hilliard's

2   property rights expired at the latest December 30th, 2016.

3          So, even if the Court were to agree with

4   Mr. Hilliard, which we don't think you should, but if you were

5   to, that -- that relief would not entitle him to any further

6   action, because that -- you could still find that and then find

7   that the contract also expired, and therefore he's not entitled

8   to any further relief.  And we cite to both the *Wylie* and

9   *Zingiber* cases holding that if a declaratory judgment would not

10  result in any relief and have no practical effect on the

11  parties' primary dispute then the entire case is moot.

12         Hilliard also asserts an argument in defense of that

13  point that he allegedly couldn't close because he could not

14  figure out the purchase price due to Murphy Land's not

15  supplying the proper financial information.

16         And that argument fails for two reasons, Your Honor.

17  First, the parties agreed to a minimum or what I'll call a

18  floor price of $13.68 million.  However, the purchase price was

19  unsettled under the provision only in the sense that it could

20  go up, so it could increase from the floor price, to reflect

21  capital improvements that Murphy Land had made on the property,

22  which could also be subject to dispute.

23         But that application to reflect the capital

24  improvements made by Murphy Land could only result in Hilliard

25  paying more than the floor price, a benefit to be sought by us,

1   by Murphy Land, not by Hilliard.  So, Hilliard's apparent

2   position is that he couldn't figure out how much more he had to

3   pay at closing, and that's just simply illogical.  He could

4   have figured out, at minimum, the floor price.

5          And there is zero evidence in the record that

6   Hilliard tried to close or consummate on the floor price.

7   That's undisputed.

8          THE COURT:  So, just so I'm clear, you are telling me

9   that he could have offered and shown he was willing and able to

10  pay the 13,680 million, and then you had the right to counter

11  to say, "No, we have made these improvements, so the real price

12  is this."

13         MR. BOLINGER:  That's right, Your Honor.  And, in

14  fact, he actually did have the higher number that we contended

15  the capital improvements on, which that's in the record.  I

16  believe it's roughly $4 million.  I will get the exact number

17  here in a minute.

18         But the -- so, not only did he know what the absolute

19  minimum floor price was, he also knew what we were contending

20  would be the additional price for the capital improvements.

21  And he seems to be suggesting, "Well, he couldn't close,

22  because somehow that number was totally incalculable."  And

23  that's just not supported in the record, Your Honor.

24         We also cited some important cases about the

25  importance of timing in time-is-of-the-essence agreements, Your

1  Honor.  In the reply brief, specifically *Machold, Kessler,*

2  *Hinkle*, which all support the idea that the party seeking to

3  enforce a purchase agreement has to tender the purchase price.

4  And there's been absolutely no evidence in the record

5  indicating that the floor price of the 13.68 million was

6  tendered.

7          Additionally, Your Honor, as a point of law to what

8  Mr. Hilliard appears to be arguing, which is that the purchase

9  price was totally unknowable, and that there was no way of ever

10  figuring it out, and that it was completely uncertain, well, if

11  that's the case, Your Honor, then that -- the entire contract

12  would also fail, because a price and a sufficiently definitive

13  purchase price is an essential and material term of a contract.

14  And that's simply well established under Idaho law.  So, if I'm

15  understanding Hilliard's argument correctly, then the entire

16  agreement would be unenforceable.

17          Moving on, Your Honor, to the unpled damages theory.

18  The -- and also, Your Honor, if the purchase price was so

19  unclear, then it would -- this agreement would be nothing more

20  than an agreement to agree.  And there's a lot of Idaho law

21  supporting the idea that mere agreements to agree are also

22  unenforceable.

23          Moving on to Hilliard's damages theory, he --

24  Mr. Hilliard tries to sidestep the mootness problem by

25  asserting as an opposition argument to an unpled damages claim

1    that he's entitled to $3 million worth of lost crop damages.
2    But as noted in the reply, Your Honor, the Court should not
3    recognize that damages claim, because Hilliard sought only a
4    declaratory judgment, and he failed to plead a breach of
5    contract claim.  The only claim asserted in the complaint is a
6    claim for declaratory judgment.

7         However, even if Hilliard had pled a breach of
8    contract claim, his asserted damages theory bears no connection
9    to the alleged purpose of the option agreement.  So, there's a
10   disconnect between the purpose of the option agreement and the
11   damages that Hilliard is asserting.

12        The -- in the option agreement, Hilliard could only
13   exercise the option and obtain the land, quote, "for, and only
14   for the location of a nuclear power plant facility."  However,
15   Hilliard's only disclosed damages claim is purported for --
16   purportedly for the loss of crops he allegedly would have been
17   able to grow had he purchased the property.

18        So, that theory is not viable for two reasons.
19   First, the agreement between the parties expressly states that
20   Murphy Land had the rights to the profits on the crops between
21   the date the option was exercised and the date the property was
22   transferred.  And that's -- if you -- in the record, Your
23   Honor, at Docket 21-3, page A-4.  And it is entitled "Seller's
24   Right to Remove Growing Crops."

25        "Seller, i.e., Murphy Land, shall have the right to

1    remove any and all growing crops on that portion of the subject

2    property to be purchased hereunder, or, in the alternative,

3    buyer may elect to reimburse seller for any documented costs

4    incurred in the growing of the crops."  That's at Section 9(c).

5        So, even if that's true, Your Honor, that he could

6    recover the crops, the agreement specifically says that Murphy

7    Land is entitled to the profits from those crops between the

8    exercise of the option and the closing.  So his damages theory

9    fails.

10       Aside from the fact, Your Honor, that the entire

11   purpose of the entire agreement was for Hilliard to allegedly

12   be able to exercise the option for the strict purpose of

13   locating a nuclear power plant facility on the property.

14       So there's no objective evidence in the record that

15   Hilliard could have ever constructed a nuclear power plant

16   facility on the property.  No building permit, no license from

17   the regulatory -- the Nuclear Regulatory Commission.  Nothing.

18   And any assertion of damages stemming from a nuclear -- the

19   failure to be able to locate a nuclear power plant would be

20   inherently speculative.  It would be speculation premised on

21   speculation.

22       Last, Your Honor, again, and although unpled, the

23   specific performance which Hilliard suggests he might

24   eventually plead, which has not been pled, is impossible,

25   because Murphy Land already sold the property in 2017.

1          So -- and there's case law.  Specifically, we cite

2     this in our reply brief, the *Paloukos* and *Fazzio* case, that

3     both support that a Court should not order specific performance

4     when that performance is impossible.

5          And it would be impossible for Murphy Land to

6     specifically perform this contract and turn over and close the

7     property to Mr. Hilliard because we no longer own it.

8          So with that, Your Honor, I will reserve the rest of

9     my time for rebuttal unless you have any questions, Your Honor.

10         THE COURT:  I do not.  Thank you.

11         MR. BOLINGER:  Thank you.

12         THE COURT:  Go ahead, counsel.

13         MR. DAWSON:  Your Honor, I will be very short today.

14         I believe that our position, both legal and factual,

15    is set out in our opposition to this motion as well as the

16    declarations, and I do not intend to address unpleaded theories

17    or anything that is not within the four corners of the

18    complaint before you.

19         My understanding is that the motion for summary

20    judgment, at least as originally drafted, had two essential

21    components.  One was Mr. Hilliard did not exercise correctly.

22    I believe that is no longer on the table if I understand

23    counsel correctly.  And the other was that things should have

24    happened in 2016.  They didn't happen.  And as a result of

25    that, there can be no liability to Murphy Land Company.

1        The issue here, Your Honor, is a fundamental issue in
2   real property matters.  And that is what is the price?  And if
3   you look at the option agreement, it's short.  It's
4   well-drafted.  It's not -- it's very clear.  And what the
5   option agreement says is that Mr. Hilliard had the right to
6   repurchase this property, and that was about ready to expire at
7   the end of 2016.

8        And as we all know, an option to purchase is a
9   unilateral contract.  The offeror, in this case Murphy Land
10   Company, as part of the transaction where Murphy Land Company
11   purchased this property, gave a negotiated option.  And
12   Hilliard had the right to repurchase within a certain period of
13   time for a certain amount of money.  The certain amount of
14   money is the problem.

15        Because as you can see, $13 million, as the base
16   price here, is a fairly significant amount of money.  And
17   Mr. Hilliard had the right, Your Honor, and we suggest that
18   Murphy Land Company had the obligation to let Mr. Hilliard know
19   what the price was.

20        And that is strict -- that is in the option
21   agreement.  It gives us a roadmap.  It tells you precisely what
22   Murphy Land Company had to do.

23        And the issue, Your Honor, is in the option
24   agreement, the distinction between capital expenditures on the
25   one hand and regular expenses on the other.  And the option

1  agreement says that the purchase price or the strike price, the

2  option price is a certain amount of money plus whatever Murphy

3  Land Company has expended for capital improvements.

4         Now, looking at the underlying facts here, as the

5  Court knows, I know you read the declarations but not the

6  emails and whatnot, but I'll represent that I was in

7  communication with Mr. Schossberger during this period of time

8  for unrelated matters.

9         And he came -- not unrelated to this property, but

10 not this issue.  And Mr. Schossberger, on behalf of Murphy Land

11 Company, came to me and said, "We will waive our right to fees

12 and costs in the *Hilliard versus* -- or the *Murphy versus*

13 *Hilliard* case," which was 100,000, or 150- or 80-, whatever it

14 was ultimately, "if you give up -- if Hilliard gives up his

15 right to exercise this option."  That's the beginning of the --

16 of the road.

17        And as I indicate in my declaration, well, that could

18 be a good deal or a bad deal.  I don't know.  I have no idea.

19 So, we did two things, Your Honor.  First of all, we

20 commissioned an appraisal of the property.  And if that

21 appraisal had come back and the property was worth less than

22 13-point whatever million dollars, we wouldn't be here.  Or if

23 the appraisal had come back, and it was worth just marginally

24 more, we wouldn't be here.

25        But the appraisal came back at $18 million.  I

immediately gave that to Mr. Schossberger along with all of the
materials relating to the nuclear power plant entitlement going
back for years.  It's been an ongoing process.  But that's --
and so it looked that in order to make a determination, first
as to Mr. Schossberger's -- Schossberger's -- forgive me --
suggestion, that we exchange the right to exercise the option
and to give up the right for costs and fees in the underlying
action, we needed a piece of information based upon the option
agreement.

          Again, it's not difficult.  The option agreement says
this.  "In this time," and that is in 2016, "you have the right
to exercise this plus capital expenditures."  And what I
received back, Your Honor, and why we're here is not the
underlying documents.  Very specific in there.  It's the --
it's the receipts; what has actually been expended.

          We never got that.  What I got from Mr. Schossberger
was a one-page -- it appears to be an Excel spreadsheet, which
coincidentally appeared to be almost to the dollar the
difference between the option strike price and the appraised
price, 4 million some odd dollars.  Now, that could be right.
I don't know.

          And then I kept saying and trying to point out,
"Well, that's interesting.  Give us the underlying financial
records.  We can take a look at them."  We never got that.

          What we got, Your Honor, was, "You don't have the

1    right to anything else."  It's in the emails here.  "Unless you

2    exercise the option," which we did.  I said, "Okay.  We

3    exercise the option.  Now please let us know what the price

4    is."  To this very moment, Your Honor, we have never had a

5    response as to what the price is.

6            Now, I would suggest, Your Honor, that the argument

7    that we should have gone out, opened an escrow, gone through

8    that, and frankly gotten $13.8 million and put it into that

9    escrow, and maybe it would close and maybe not.  Maybe at that

10   point they would come back with the actual price, is -- is not

11   a good argument.  They were obligated to give us the actual

12   price under the terms of the option.  They did not do that.

13   That is a condition precedent to our actions, anything else

14   that we have to do going forward.

15           Now, that, Your Honor, meant that there was a breach

16   of this agreement when they refused to come up with that

17   information.  And that quickly gets back to, "Well, is that

18   information important or not?"  The price is important, it is

19   critical, and that was missing.  We were kept from getting that

20   price.  And Your Honor, as a result of that, to this day, we

21   don't know what the option price was.

22           Now, the fact that they have now sold the property,

23   apparently -- the first I have heard of that.  Okay.  The fact

24   that there are unpleaded claims in here, yes, there are

25   unpleaded claims.  We attempted to do this as succinctly as

possible.  Declaratory relief.  We have the right.  The option

was exercised correctly.  That's a yes or no.  Apparently we

get a yes now.  Then the question becomes, "Well, what's the

price?"

          And again, Your Honor, to this very moment, we don't

know what the price was that was a condition precedent to any

further action on our part.  As a result of that, Your Honor,

we believe that the motion for summary judgment should be

denied.  Thank you.

          THE COURT:  Before you sit down, I'm still confused.

What exactly is your client seeking in this lawsuit?

          MR. DAWSON:  Well, he's seeking a declaration that

the option was exercised.  Now, with this additional

information, apparently, that the property is -- has been sold,

he would -- after surviving summary judgment, he would

certainly amend the complaint to take into account what we have

recently learned.  And what that would be, Your Honor --

          THE COURT:  Seek actual damages as opposed to --

          MR. DAWSON:  Yeah.  Sure.  We attempted to keep this

as simple and as succinct as possible, frankly, in the hope

that the -- we would get the price.

          Because again, Your Honor, let me -- let me say this.

And if it turns out that in 2016 and/or from 2010 to 2016, that

in fact Murphy Land Company had expended, for capital

improvements, 4,200,000, whatever it said on that spreadsheet,

1   then -- then this action is over.  Because we believe that any

2   way you slice it, that Mr. Hilliard is obligated to pay, going

3   back to September 2016, the -- the option strike price, the

4   13.8 million, plus the amount that Murphy Land Company shows

5   that it expended for capital improvements.  That's the missing

6   piece of the puzzle.

7            Now, in terms --

8            THE COURT:  You say it's over because he wouldn't pay

9   that?

10           MR. DAWSON:  He -- right.  Contractually, Your Honor,

11  if -- he has a contractual right, and that is to purchase this

12  property, or repurchase in this case, but to purchase this

13  property for a certain amount of money.

14           Now, if it turns out that what Mr. Schossberger sent

15  to me, that spreadsheet, which is the same as the difference

16  between the appraised price -- but if that's right, then it

17  wouldn't make any sense for Mr. Hilliard to proceed further,

18  because the -- the price, which would include the option strike

19  price and the amount of capital expenditures, would equal the

20  appraised value as of 2016.

21           That's what we were looking for here.  That's what we

22  continued to look for.  And we believe, Your Honor, regardless

23  of legal theory and regardless of change in circumstances down

24  the road, our obligation, under the option agreement, is to pay

25  the actual price, which would be the base price and the capital

1    expenditures price, once we get that information.  And I

2    suspect that -- our belief is that the capital expenditure

3    price was about 1/10th of what they were saying.  But we don't

4    know, because we haven't seen the books, the records, nothing.

5           So, if it turns out that the actual price to

6    purchase, to exercise the option was the -- was the strike

7    price and the capital expenditures, documented and approved --

8    Mr. Hilliard has to approve that.  And if that's close to the

9    appraised price, then we go away.  We don't think that it is,

10   but this is all back in 2016.

11          THE COURT:  Right.

12          MR. DAWSON:  And we have to look at it through that

13   lens.  So, what we are asking for from the Court, now that we

14   know about the sale of the property, is, first of all, to deny

15   summary judgment.  Let us amend the complaint to take into

16   account the new circumstances.

17          And at some point, we hope, Your Honor, we're going

18   to find out what the price was back in 2016.  And at that

19   point, again, we could very well say, "That doesn't make

20   economic sense."  If the -- if the legitimate difference is

21   between the strike price and -- and the capital expenditures.

22   If it's only a million or 2 million, I know that sounds funny,

23   but that's realistic in this context.

24          But if it's what we think it is, which is

25   significantly more than that, then we'll proceed.  But we're

1    still looking for that information.  Why we didn't get it, I do

2    not know.  And you'll see in my declaration and emails, when

3    you look at them, I did what I thought I could do to try to get

4    that information in reason.  We still don't have it, and we

5    simply don't know.

6           But fundamentally, Your Honor, going back to 2016, we

7    think that we have a right to know what the price is.  And I

8    understand counsel's argument.  "Well, you should go out,

9    within 60 days, open up an escrow, do this, do that, and come

10   in.  And, oh, by the way, deposit $13.8 million into that

11   escrow without knowing what the price is."

12          We don't think that's a reasonable position.  We

13   don't think we were obligated to it.  We think that the

14   obligation to come up with the money is condition precedent to

15   anything else.  But what we are looking for now is -- again, it

16   seems odd here in November of 2019, we're still looking for the

17   actual price.  Because any way you slice it, going back to

18   counsel's argument, "Go out there.  Get $13.8 million.  Put it

19   in to this escrow within 60 days."

20          And maybe that's the right price.  Maybe that's not

21   the right price.  "We've got capital expenditures."  We believe

22   that there are capital expenditures, not $4 million worth.  So,

23   what would happen under counsel's suggestion?  We go out and

24   get the money, significant amount of money.  Open up the

25   escrow.  Do it within 60 days.  And could we reasonably expect,

1    at that point, Your Honor, that Murphy Land Company would say,

2    "Oh, okay.  There were no capital expenditures.  It was

3    $4 million to zero."  No.  There would be litigation, but we

4    would have $13.8 million tied up unless we came to -- came to a

5    resolution of it.

6         So, we don't think that that is a suggestion that

7    makes any sense, and we don't think that we were obligated to

8    do that, because they had to come up with a price, and they

9    didn't do it.

10        THE COURT:  Okay.  Tell me about the third paragraph

11   in your prayer for judgment.  That's the one talking about the

12   value of all growing crops.

13        MR. DAWSON:  Right.

14        THE COURT:  Counsel for the defense is arguing that

15   that's not even part of the contract.  It shouldn't be here.

16        MR. DAWSON:  Well, it's not part of the contract.  It

17   facially is not part of the contract.  But, Your Honor, the

18   following, and I'm going to suggest the following.  And that is

19   going back to the nature of what we're talking about here, just

20   on a very fundamental and theoretical basis, we had a

21   contractual right to purchase this property if we did certain

22   things.

23        Murphy Land Company had an obligation to tell it to

24   do certain things, one of which is tell us the price.  And we

25   got stalled.  Now, that happened in 2016.  And Murphy Land

1    Company, in the underlying action, said by way of a

2    declaration, Your Honor, that was used in the underlying

3    action, and I believe was submitted to the Utah or the --

4    forgive me -- the Idaho Supreme Court, that said that we make

5    $3 million a year on this property, which was a justification

6    in the other action, in the underlying action for the amount

7    that was withheld, because Mr. Hilliard couldn't deliver it,

8    because somebody was on there and filed a bankruptcy.

9           So, this prayer for relief, Your Honor, is -- again,

10   if we go back to 2016.  Snapshot in time.  If we had made

11   the -- the request, "Tell us what the actual numbers are for

12   capital improvements," and if that had come up in what -- the

13   amount that we think it will come up with, then the amount of

14   the -- the amount to exercise the option would have been, say,

15   less than $15 million is what it boils down to.

16          With an appraisal of $18 million, probably it would

17   have made economic sense to do it.  I'm just telling you what

18   our thought process is here.  Were that to have been done, in

19   2016, my understanding is that there was a 2016 profit, if you

20   will, a 2017 profit, a 2018 profit, and perhaps a 2019 -- well,

21   maybe not, because they no longer own it.

22          But the question becomes, at that point, if we did

23   everything that we were supposed to do, and if there was a

24   breach of the option agreement in 2016, and in order to put us

25   into the position that we should be in, would there be

1   ancillary damages?  Yes, there would be.  Now, is it
2   speculative, as counsel is saying?  At this point, yes.
3   Anything I'm saying is -- other than the declaration by the
4   Murphy Land Company principal, in the other action, with the
5   $3 million a year profit -- is -- is, you know, speculation.
6           But that is an aspect or a part of our prayer for
7   relief.  That is correct.  But that assumes that we go back to
8   2016, take a snapshot, and -- and going forward.
9           THE COURT:  Okay.  Thank you.
10          MR. DAWSON:  Thank you, Your Honor.
11          THE COURT:  Counsel, your reply.
12          MR. BOLINGER:  Your Honor, I'd like to start out by
13  pointing out some of what Mr. Dawson appeared to be discussing
14  and arguing is not in the record.
15          There -- there is information about Mr. Hilliard's
16  purported motivations and mental state about how to decide the
17  price, everything that -- regarding that point.  That's not in
18  the record.  And, accordingly, we would encourage the Court to
19  go back and look at what is properly before Your Honor in terms
20  of the evidence.
21          Number two, it was interesting to me that Mr. Dawson
22  said that the contract here is, quote, "Very clear," I believe
23  he said.  Well, he actually argued in his brief that the
24  contract was ambiguous.  Now, I don't think it is ambiguous,
25  but can't have it both ways.  And the fact that I -- I agree

1   that it's pretty clear.

2           And this idea that we couldn't take action because --

3   until we knew, you know, what the purchase price was, and that

4   was a condition precedent, well, that's just not reflected in

5   the actual agreement.

6           There's language in Section 5 about the purchase

7   price, which would be Docket 21-3 at page A-2.  "The purchase

8   price shall be increased by the amount of funds so expended by

9   seller and as approved by buyer following a review," blah,

10  blah, blah.

11          So, the idea that there was some -- it was incapable

12  of moving forward until they received all of this information,

13  that's just not reflected in the terms of the parties'

14  agreement.

15          Nothing Mr. Dawson argued really rebuts and,

16  therefore, concedes that they didn't close within 60 days, and

17  that the contract expired in December of 2016 without

18  Mr. Hilliard filing any action.  He didn't file an action for

19  breach of contract.  By that time period, he didn't file any

20  action for specific performance.  He didn't file any action

21  trying to get relief and say, "We have this contract, but we

22  can't enforce it because we don't have this information," et

23  cetera, et cetera.  Instead, waited more than two years nearly

24  to take any action on it.

25          Now, moving to this point about requesting leave to

1    amend the complaint, we filed this motion for summary judgment

2    in November of 2018.  And due to some procedural aspects of the

3    case getting shifted around -- it was moved from Judge Bush,

4    got reassigned to Judge Lodge, and got reassigned to Your

5    Honor.  So, we have some real reasons why we didn't get to the

6    argument until today.

7            But Mr. Hilliard and his counsel have known that this

8    property was sold in 2017 for over a year, and yet they didn't

9    take any action to amend their complaint.  They didn't come in

10   and say, "Oh, well, in that case, we better try to amend our

11   pleading."  And we pointed out in the briefing, Your Honor,

12   because we anticipated that this may come up, that a motion for

13   summary judgment is not the time period to try to fix the

14   pleadings.  That we are pretty late in the game to be looking

15   at that idea about trying to fix this complaint.  So, there's

16   that problem.

17           Moreover and more importantly, an amended complaint

18   would be futile, because there's no way he can plead a claim

19   with recoverable damages, because the damages would have to

20   relate to the idea of a nuclear -- somehow related to the

21   inability to profit from placing a nuclear power plant facility

22   on this property.  That was the only reason Mr. Hilliard ever

23   was going to be able to exercise this option.

24           And yet from what I heard from counsel, the only way

25   they are going to try to recover damages would be this idea of

1  crop damages.  So that just hasn't been rebutted.  So amending

2  the complaint to assert a breach of contract claim would be

3  futile.

4         For the same reason, amending the complaint to try to

5  assert a claim for specific performance would be futile,

6  because there's no debate.  We no longer own the property.

7         THE COURT:  As of what date?

8         MR. BOLINGER:  That's in the record, Your Honor.  I

9  believe it was --

10        THE COURT:  Or at least what year?

11        MR. BOLINGER:  I believe it was April of 2017, Your

12  Honor.  April 17th, 2017.

13        And moving on to the idea about, well, we didn't know

14  what the price was.  As -- the parties appear to be in

15  agreement.  There was a communication to Mr. Dawson from

16  Mr. Schossberger -- this is in the record -- where

17  Mr. Schossberger sent a spreadsheet, a spreadsheet -- again,

18  the spreadsheet is in the record.  It has all the information

19  about how we -- it's itemized.  It lists what each particular

20  capital improvement costs, and it comes to a total of

21  four-point -- $4,406,896.

22        So, Hilliard knew what the floor price was.  He knew

23  what the capital improvement cost was.  There was a procedure

24  set in place in the agreement that there was going to be a

25  potential way to work out this dispute and still close, and yet

1    that closing never got scheduled.  The floor -- the floor price

2    was never tendered into the escrow agreement.  There was no

3    action taken on this contract by the time period of the

4    contract of December 30th, 2016.

5              Unless Your Honor has any additional questions, I

6    believe I rest.

7              THE COURT:  The only additional question is a factual

8    one again.  Do we know when that spreadsheet was provided to

9    the plaintiff?

10             MR. BOLINGER:  Yes, Your Honor.  That's in the

11   record.

12             THE COURT:  Okay.

13             MR. BOLINGER:  And that's -- all of the documentation

14   about that has been -- has been turned -- provided over.  I can

15   look it up right now and give you the exact date, but that is

16   in record.

17             THE COURT:  If it's in the record, my clerk probably

18   already has it in her notes.  We will be okay.

19             All right.  Thank you.

20             MR. DAWSON:  Your Honor, can I briefly respond or are

21   you done with this?

22             THE COURT:  I don't normally allow it.  If you can

23   keep it under two minutes.

24             MR. DAWSON:  I will keep it under 90 seconds.

25             THE COURT:  All right.  Go for it.

1          MR. DAWSON:  All right.  Thank you.

2               First of all, in terms of amending the pleading, Your

3     Honor, my understanding of practice in federal court, at least,

4     is you typically don't amend pleadings while the summary

5     judgment motion is pending.  And for reasons discussed by

6     counsel, this has been pending a long time.  We were aware of

7     that.

8               I don't believe that there was a mechanism to be

9     amending a pleading.  It's usually not well taken if there's a

10    summary judgment motion pending.

11              Number two --

12              THE COURT:  Your intent would be if you get past

13    summary judgment, then amend.

14              MR. DAWSON:  Of course.

15              THE COURT:  Okay.

16              MR. DAWSON:  And then number two, when we get back to

17    what I think is the central issue here, which is the price,

18    Your Honor, Mr. Schossberger, in fact, did send me a

19    spreadsheet.  I asked him many times, in writing -- you will

20    see it -- "Would you give me the backup information per the

21    agreement?"  He simply did not do it.

22              As a matter of fact, he said, "I will not do it" --

23    it's also in an email here -- "unless you exercise the option."

24    We -- I said, "Okay.  We exercise the option.  Now would you

25    give me the information?"  Silence.  We've never gotten it, but

1    not per the contract.

2          And I think one thing that counsel agrees with here,

3    is the contract is pretty well-written.  It's pretty clear.

4    The obligations of the parties are pretty clear.  And the

5    question, Your Honor, is who breached first.  We contend that

6    Murphy Land Company did.

7          As a practical matter, if you are determining what

8    the price is, if it's within your knowledge as to what the

9    price, especially in the millions and millions of dollars, it's

10   your obligation to come up with and strictly comply with the

11   contract which says, "It's not a spreadsheet.  It's backup

12   documentation."  Should have been easy to do.  They didn't do

13   it.

14         Thank you, Your Honor.

15         THE COURT:  Thank you.  Counsel, you can have the

16   last 30 seconds if you want.

17         MR. BOLINGER:  Thank you, Your Honor.

18         I just would like -- the final point, I guess we'll

19   make, is all of these arguments could have been brought

20   about -- prior to December 30th, 2016, the -- the expiration

21   date of the contract.  The action wasn't brought until

22   significantly later.

23         And our position is that should have happened if he

24   was going to try to enforce his rights on the contract prior to

25   the expiration date.  I will leave it at that, Your Honor.

```
1    Thank you.
2              THE COURT:  All right.  I will take the matter under
3    advisement, we will issue a written decision, and we'll get it
4    out to you as quickly as we can.  Anything else for today?
5              MR. DAWSON:  Nothing else today other than you've got
6    the most beautiful courtroom I have ever seen.
7              THE COURT:  The problem is with the jury sitting
8    right there, you get distracted.
9              MR. DAWSON:  Yeah.  It's remarkable.
10             THE COURT:  It is great.
11             MR. DAWSON:  So, thank you very much.
12             THE COURT:  Court is in recess.
13             MR. BOLINGER:  Thank you, Your Honor.
14         (Recess 10:45 a.m.)
15                             --oOo--
16                   COURT REPORTER'S CERTIFICATE
17
18        I, KATHERINE EISMANN, certify that the foregoing is a
19    correct transcript from the record of proceedings in the
20    above-entitled matter.
21
22    Date:  February 7, 2020.
23
24                         _____
25                         Katherine Eismann, CRR, RDR
```